UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

TEAG FOX,

                       Petitioner,

    v.

CALVIN JOHNSON, *et al.*,

                   Respondents.

Case No. 2:21-cv-00380-CDS-NJK

ORDER

Teag Fox's pro se 28 U.S.C. § 2254 petition for writ of habeas corpus is before the court for adjudication on the merits (ECF No. 6). As discussed below, the petition is denied.

I.    **Background & Procedural History**

In December 2015, Las Vegas Metropolitan Police Officer Greg Sedminik responded mid-day to a domestic disturbance at an apartment complex. Fox had no connection to the disturbance but ultimately pulled a gun on Sedminik. They exchanged fire, and Sedminik suffered a near-fatal gunshot through his chest and back.

In July 2017, a jury in Clark County, Nevada convicted Fox of attempted murder with a deadly weapon, battery with a deadly weapon resulting in substantial bodily harm, and discharging a firearm at or into occupied structure, vehicle, aircraft, or watercraft (exhibit 30).[1] The state district court sentenced him to an aggregate term of 11 to 40 years. Exh. 33. The court entered the judgment of conviction on October 4, 2017. Exh. 34. The Nevada Court of Appeals affirmed Fox's convictions in September 2018. Exh. 49. That court affirmed the denial of his state postconviction habeas corpus petition in August 2020 and denied Fox's petition for rehearing in October 2020. Exhs. 65, 67.

Fox dispatched his federal habeas corpus petition for mailing on or about March 1, 2021 (ECF No. 6). Respondents have answered the petition, and Fox replied. ECF Nos. 13, 27.

---

[1]    Exhibits referenced in this order are exhibits to respondents' answer, ECF No. 13, and are found at ECF Nos. 14-20, 25.

## II.       Governing Standard of Review

**Antiterrorism and Effective Death Penalty Act (AEDPA)**

The AEDPA provides the legal standards for consideration of the petition:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693–694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403–04 (2000)). A court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted)).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and

nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06, and citing *Bell*, 535 U.S. at 694).

A state court's decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" rather, "[t]e state court's application of clearly established law must be objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409–410, 412.).

To the extent the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). Under this clause, federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972. Under 28 U.S.C. § 2254(e)(1), state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 181.

. . .

. . .

. . .

. . .

. . .

III.    **Trial Testimony**[2]

LVMPD officer Greg Sedminik testified that he had been a police officer for about twenty years. Exh. 25, pp. 24–89. On December 17, 2015, he responded around 11:30 a.m. to a domestic disturbance call at an apartment/extended stay motel complex. He testified that he was walking toward the complex office when he encountered Fox. At first Fox asked him in a casual tone why he was there. But Fox soon started staying "Why are you here to kill me? You're here to kill me." Sedminik started backing away. Fox suddenly brandished a firearm. The officer ran, seeking cover. Fox seemed to be following him, pointing his gun at the officer. Sedminik fired first, then Fox fired about three shots; a bullet entered Sedminik's armpit and exited his back. He suffered a bruised lung, shattered ribs, and sustained long-term nerve problems in his arm and hand.

James Rankins testified that he lived in the apartment complex. Exh. 25, pp. 130-163. He did not know Fox's name, but he knew who he was because Fox usually parked his Cadillac near Rankins' vehicle. On the day in question, Rankins passed Fox as he was exiting the Cadillac. He then saw Fox in the courtyard pull a large handgun and point it at a police officer. Rankins ran but he looked back and saw the officer fall to the ground. He heard gunshots but did not see anyone shooting.

Walter Lawson testified that he had a data security business and Fox worked for him for about a year as a senior network administrator. Exh. 25, pp. 205-232. He described Fox as an exemplary employee. On the day in question Fox came into work around 8 a.m. as usual. Fox was on his lunch break, and Lawson was Christmas shopping when he received several calls from Fox a little before noon. His cell phone dropped several calls, but Lawson finally spoke with Fox. Fox told him that his car had broken down and that he was sick. Lawson said Fox had frequent car trouble. Lawson agreed to pick up Fox because they had work to complete that

---

[2]     The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering Fox's claims.

afternoon. He picked up Fox at a gas station. Lawson noticed that Fox was sweating, coughing, and wearing a t-shirt instead of his usual company Polo shirt. They went to Lawson's home office to work; Fox's demeanor was calm. After three or four hours, Lawson agreed to drop off Fox with a friend who was going to provide transportation. As they were driving, Fox noticed a police helicopter and insisted it was following them. Lawson told him "you're being paranoid again. . . they're not looking for you or any of that." *Id.* at 237. They briefly lost sight of the helicopter, then it suddenly appeared very close to the vehicle. Lawson said he almost swerved and hit what he found out later to be an undercover police truck. Lawson came to a stop sign, and police rammed their vehicle. The police yelled at Fox by name and directed both men to exit the car.

Lawson testified that he knew Fox had a Beretta; he teased Fox about it because he did not like that type of gun. Over the time they worked together Fox told him about four or five times that the police conspired against him. Fox would tell him that the police constantly harassed him, including driving up next to his car, and making threatening gestures. He told Lawson police had cut his phone lines and poisoned him and that he had sought help from the FBI and NAACP.

Teag Fox testified that on the day in question as he was leaving for work, he took the Beretta handgun that he owned and had a concealed weapon carry permit for with him and placed it under the front seat of his car. Exh. 27, pp. 91-146. He drove back to his apartment for lunch and took his gun with him when he exited the vehicle. He was walking toward his apartment and saw a police officer approaching. He asked the officer what was going on or whether there was a safety concern. They were about 15 feet apart; he realized the officer was not paying attention at all, so he stopped speaking. They passed each other. Fox stopped and removed his vaporizer inhaler (large e-cigarette) out of his pocket to smoke. He then noticed the police officer run around the corner. Fox thought it was odd, but he figured the officer was pursuing a suspect. The officer changed direction, re-appeared from around a corner and Fox was "looking down the barrel of a gun." *Id.* at 106. The officer said nothing, then Fox felt wind go right by his face and realized the police officer was shooting at him. Fox retreated behind some

cones. He said it was just an automatic reaction; he reached to the small of his back for his gun and returned fire. A woman started screaming. When Fox saw the officer was distracted, he took off running away from the apartments and toward a gas station. The officer fired at him as he fled. He called Lawson and ended up going to Lawson's home to work that afternoon. He said nothing about what had occurred. He hid his gun in Lawson's outdoor barbecue. He testified similarly to Lawson about how and when the police apprehended them.

On cross examination he said he had an issue with the government/law enforcement surrounding his divorce and child-custody proceedings. He said that his anger was specific to those family matters and that he did not harbor a larger fear, hatred, or dislike of the police in general. He explained:

> A: Okay. This is what happened with that. I caught my wife cheating on me when I was overseas in Saudi Arabia. She was sleeping with her supervisor. With that, I led my own internal investigation myself and I confronted the man that she was cheating with. That man told me that he was a CIA agent who was working secretly for the military base. I didn't believe him. I wrote a report to her commander and then that started the process of our divorce. So yes, I did have an issue with the government because I caught my wife cheating with her supervisor when I was serving my country in the United States Air Force.
>
> Q: Okay. How long did that issue with the government last?
>
> A: It always left me sore, because it's been 14 years 14 now and I have not been able to see my son. I tried to call him when he was two years old and I tried to get onto the base and they would not let me on the base. And I miss my son so much, but there's nothing I could do, because when you try to get access to a base, unless you have military ID card or anything like that, there's no help. I tried to call the police department. They said they couldn't help me get on the base. So from that, it's left me very sour to the government and to the people who claim I have a divorce decree that says I'm supposed to be with my child. And no one would help me do that. So yes, it left a sour taste in my mouth for – I did – I don't like them. . .
>
> Q: I'm asking you, how long did you obsession with the government last after that happened with your wife?
>
> A: To this day –

Exh. 27, pp. 116-118.

1    Police detective Craig Jex testified that he investigated the incident. Exh. 27, pp. 36-83.

2    He said that a vaporizer inhaler was recovered from the car in which Fox was apprehended. *Id.*

3    at pp. 46-47.

4    IV.    **Discussion**

5    a.  **Claim Raised on Direct Appeal**

6    In ground 5, Fox argues that his Sixth Amendment right to counsel was violated when the

7    prosecution questioned him regarding protected attorney-client communications and implied

8    that he "rehearsed" his testimony (ECF No. 6, pp. 38-41).

9    Attorney-client privilege is a rule of evidence that has not been held to be a constitutional

10    right. *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985) citing *Maness v. Meyers*, 419 U.S. 449,

11    466 n.15 (1975). There are some circumstances, however, in which government interference with

12    the confidential relationship between a defendant and counsel may implicate the Sixth

13    Amendment right to effective assistance of counsel. *Clutchette*, 770 F.2d at 1471. Such interference

14    violates the Sixth Amendment only when it substantially prejudices the defendant. *Id.*; *U.S. v.*

15    *Irwin*, 612 F.2d 1182, 1186-1187 (9th Cir. 1980).

16    Prosecutor John Giordani asked Fox about whether he had discussed the events with his

17    defense counsel, Michael Sanft:

18    Q: . . . Mr. Sanft ask you to walk through what happened on the crime scene –

19    A: Yes.

20    Q: -- do you remember that? You, I presume, have rehearsed that before, or at
21    least discussed, you know, what you'd say today, right?

22    A: Rehearsed what?

23    Q: Your story?

24    A: I'm not sure what you're saying.

25    Q: You didn't think about what you were going to say today, talk about it, look
26    at the evidence and strategize?

27    A: No, I didn't –

28    Mr. Sanft: Objection, Your Honor, I think –

1          THE WITNESS: -- strategize.

2          MR. SANFT: I think it traipses into attorney/client privilege.

3          MR. GIORDANI: I'm not asking for that.

4          MR. SANFT: Okay. Well, once again, I think he's asking for –

5          THE COURT: I think the question is did he – did he discuss with you his
testimony here today.

6

7          MR. SANFT: Once again, traipsing into attorney/client privilege.

8          MR. GIORDANI: No, I'm not asking for the content of his –

9          THE COURT: Right.

10         MR. GIORDANI: --protected conversations. I'm asking did you discuss it, yes
or no?

11

12         THE COURT: Yeah, that's overruled.

13         BY MR. GIORDANI:

14         Q: Yes or no?

15         A: No, I did not.

16         Q: Did not?

17         A: No.

18         Q: You have a lot on the line today, right?

19         A: Correct.

20         Q: I mean, these are serious charges; you understand that?

21         A: Yes.

22         Q: And you did not discuss what happened on that night – on that morning
with your attorney?

23

24         A: Well, you mean talk about the events that led to it?

25         Q: Yes.

26         A: Yes. I did discuss factual information with him.

27    Exh. 27, pp. 120-121.

28

The Nevada Court of Appeals rejected this claim in affirming Fox's conviction:

> On appeal, Fox argues that the State violated the attorney-client privilege by asking whether he had "rehearsed" with his attorney what he would say at trial, which implicated his Sixth Amendment right to the assistance of counsel. He further argues that the error was not harmless because the State made a clear implication that he was committing perjury, which prejudiced him because his credibility was a key issue at trial.

> At his jury trial, Fox testified; on cross-examination, the [court sets forth the exchange quoted above from the trial transcript. . . . ]

> The state did not further pursue the line of questioning. A client has a privilege to refuse to disclose confidential communications between the client and his attorney made for the purpose of providing professional legal services to that client. NRS 49.095. "Although the attorney-client privilege has been termed merely a rule of evidence and not a constitutional right, government interference with the attorney-client relationship may implicate Sixth Amendment rights." *Manley v. State*, 115 Nev. 114, 121, 979 P.2d 703, 707 (1999). But [g]overnmental intrusion violates the Sixth Amendment only when it 'substantially prejudices' the defendant." *Id.* at 122, 979 P.2d at 707 (quoting *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985)). This court reviews such violations for harmless error, meaning it will only affirm convictions where it concludes beyond a reasonable doubt that the violation did not contribute to the conviction. *Id.* at 121-23, 979 P.2d at 707-09.

> Here, even if the State's questions violated the privilege, error would be harmless because Fox fails to show that he was substantially prejudiced, as required to conclude that an attorney-client privilege violation rises to the level of a Sixth Amendment violation.[FN2] Fox employs the Supreme Court's decision in *Manley* to support his argument to the contrary. In *Manley*, the court concluded that the State's questioning damaged Manley's credibility by implying that he "had not been entirely truthful even with his own attorneys, and had either omitted information detrimental to him or simply lied to them regarding what happened the night of the shooting." 115 Nev. at 122, 979 P.2d at 708. The Supreme Court determined the issue of Manley's credibility crucial because "[Manley] claimed the shooting was accidental and only [he] and [the victim] were present when she was shot." *Id.*

> Fox argues that his credibility suffered similar damage, claiming that the State clearly implied that he was committing perjury. He asserts that this substantially prejudiced him because of competing witness testimony as to whether the officer was justified in drawing his weapon. But Fox does not demonstrate that the State's single mention of rehearsal resulted in damage to his credibility severe enough to deprive him of his right to counsel. Further, the State produced other evidence at trial that called Fox's credibility into question.[FN3] Moreover, at trial, Fox denied rehearsing or strategizing with his counsel, so that testimony further undercuts his argument. Thus, we conclude that Fox was not

substantially prejudiced, thereby precluding a Sixth Amendment violation. Therefore, no error warranting reversal occurred.

[FN2: Generally, prosecutors should avoid questions that suggest an intent to undermine the defendant's right to consult with counsel.]

[FN3: An eyewitness testified that Fox approached Sedminik and drew a gun, supporting Sedminik's testimony and refuting Fox's contention that he was holding his six-inch, fluorescent orange e-cigarette, not a gun, at his initial encounter with Sedminik. Also, Fox's employer testified that Fox had exhibited erratic behavior and had expressed extreme, negative perceptions of police and government, reportedly claiming that police had attempted to poison him, made threatening gestures to him by pulling up next to him in traffic and revving their engines, and cut his phone lines. Additionally, Fox himself testified to his 14-year grievance with the government and police regarding a custody dispute.]

Exh. 49, pp. 2-6.

The prosecutor did use the term "rehearse" although he immediately qualified it with "or at least discussed." Assuming the prosecution's insinuation was improper, Fox handled it by clearly challenging the notion that his testimony was rehearsed and also by clearly answering that what he had discussed with his attorney was the factual scenario. Moreover, the state appellate court correctly points to other evidence that called Fox's credibility into question. Fox has not shown that the prosecution's use of the term "rehearse" substantially prejudiced him. Accordingly, he has not demonstrated that the Nevada Court of Appeals' decision was an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 5.

b. **Effective-Assistance-of-Counsel Claims**

On Fox's claims of ineffective assistance of trial and appellate counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Smith v. Robbins*, 528 U.S. 259, 285 (2000). Under *Strickland*, a petitioner must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694.

When a court considers an ineffective assistance of counsel claim it "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466 U.S. at 689 (citation omitted). On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his perspective at the time. *Id*. at 689–90. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

The Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance. *Burt v. Titlow*, 571 U.S. 12, 24 (2013). It is a petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner making an ineffective assistance claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690–91. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "the standards created by *Strickland* and § 2254(d) are

both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Harrington*, 562

U.S at 104–05 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.

2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA,

both AEDPA and *Strickland's* deferential standards apply; hence, the Supreme Court's description

of the standard as doubly deferential.").

      To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must

show a reasonable probability that, but for his counsel's [unreasonable performance], he would

have prevailed on his appeal." *Robbins*, 528 U.S. at 285–86. "[A]ppellate counsel who files a merits

brief need not (and should not) raise every nonfrivolous claim, but rather may select from among

them to maximize the likelihood of success on appeal." *Id.* at 288 (citing

*Jones v. Barnes*, 463 U.S. 745 (1983)). The Ninth Circuit has explained that in applying *Strickland* to

a claim of ineffective assistance of appellate counsel:

> [t]hese two prongs partially overlap . . . In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted). Failure to

present a weak issue on appeal neither falls below an objective standard of competence nor

causes prejudice for the same reason – the issue had little or no likelihood of success on appeal.

*Id.*

**Ground 1**

      In ground 1, Fox sets forth seven sub-claims of ineffective assistance of trial counsel (ECF

No. 6, pp. 3-20).

**Ground 1(a)**

      Fox asserts that trial counsel failed to investigate certain witnesses in support of his self-

defense theory and in order to contradict the prosecution's evidence (ECF No. 6, pp. 6-15).

In general, claims of failure to investigate must show what information would be obtained with investigation, and whether, assuming the evidence is admissible, it would have produced a different result. *Hamilton v. Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994); *Wade v. Calderon*, 29 F.3d 1312, 1316-17 (9th Cir. 1994), overruled on other grounds by *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003). For investigating or calling witnesses, a petitioner must disclose the identity of witnesses, *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985); show the witnesses would have testified, *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988); and show that the testimony would have changed the outcome of the proceedings. *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1989).

For expert witnesses, the mere failure to retain an expert does not render counsel per se ineffective. *Harrington*, 562 U.S. at 106. "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Id*. However, there are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id*. (internal citations and quotations omitted). "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." *Id*.

The Nevada Court of Appeals rejected this claim in affirming the denial of Fox's state postconviction petition:

> First, Fox claimed his trial counsel was ineffective for failing to investigate eyewitnesses, character witnesses, and expert witnesses. Fox asserted that potential eyewitnesses may have supported his assertion of self-defense and character witnesses may have testified he did not dislike the police. Fox also contended trial counsel should have investigated whether expert witnesses would have provided favorable testimony concerning the forensic evidence, the police reports, and his state of mind. The district court reviewed Fox's petition and found that Fox's claims concerning potential witnesses were bare and unsupported or the potential testimony would have been irrelevant. The district court also found that overwhelming evidence of Fox's guilt was presented at trial. The district court therefore found that Fox did not demonstrate that his claims regarding investigation of potential witnesses warranted relief. *See id*. The record supports the district court's decision, and we conclude the district court did not err by denying these claims without conducting an evidentiary hearing.

1    Exh. 65, p. 3.

2    With respect to non-expert witnesses, Fox contends that his counsel should have

3    located and interviewed possible eyewitnesses, his mother and a friend, and his co-worker. Exh.

4    53, pp. 36-57. First, Fox points to Shanda Hartnell and refers to her statement to police that he

5    attached to his state postconviction petition. The statement reflects that Hartnell told police

6    that when she heard shots fired, she ran out of her apartment looking for her dog. She saw

7    officer Sedminik on his knees, and a maintenance man for the complex was bending over him.

8    Hartnell said "Elizabeth" was in the apartment with her and ran out before she did. Fox also

9    argues that counsel should have attempted to identify and interview the maintenance man to

10   contradict James Rankins' testimony regarding the shooting.

11   Second, Fox contends that counsel should have contacted Fox's mother and Fox's friend

12   Joey Ellis regarding their statements to detectives. Fox asserts that they could have testified that

13   Fox did not suffer from mental illness or delusions regarding the government or police. Fox

14   alleges that counsel failed to obtain the records from his custody dispute, which he says the

15   State used in a misleading manner.

16   Finally, Fox argues that counsel should have located his co-worker Ibraham who gave

17   him the vape that he was using the day of the incident and that was in his possession when he

18   was arrested. Fox alleges that Ibraham could have testified that because the vape leaked it had

19   to be held awkwardly, which may have made it look like a gun pointing at Sedminik. He also

20   argues that Ibraham would have been a character witness, testifying that Fox was a hard worker

21   who was saving money to buy a house.

22   Regarding experts, Fox asserts that counsel should have retained experts to evaluate his

23   mental health and to explain how the vape pen functioned. He also argued that a forensic expert

24   could have challenged the police investigation techniques and that a "human factors" expert

25   could have explained "the factors in play during the encounter between Fox and the officer"

26   (ECF No. 6, p. 14).

27   First, Fox's claims regarding the non-expert witnesses are wholly unsupported. Fox has

28   not identified Elizabeth or the maintenance man, and it is unknown whether they were

eyewitnesses at all. The court agrees with respondents that Fox merely speculates that their testimony could have contradicted Rankins' testimony that Fox fired the first shot. In fact, on cross-examination, Rankins admitted to defense counsel that he did not know who fired the first shot. Moreover, officer Sedminik testified that *he* fired the first shot.

It is also unclear that Fox's mother and friend could contradict the State's theory that Fox shot Sedminik because he was mentally ill or suffered paranoid delusions that the police conspired against him.[3] Considering all the evidence presented, even if there were any witnesses who would have testified that Fox did not suffer from mental illness and did not harbor ill-will towards law enforcement, Fox has not shown that that would have led to a different result at trial. Fox's version of events was not particularly credible, especially in light of Fox's actions after the shooting. With respect to his co-worker Ibraham, it is unknown but possible that he could have testified that he gave the vape pen to Fox and that it leaked. But Fox testified with particularity about how he was holding the vape pen at the time of the shooting, and there are no allegations that Ibraham was present at the shooting and witnessed anything. As to serving as a character witness, Fox's employer testified that he was an exemplary employee—to the extent that he had recently given Fox $5,000 for car repairs so that Fox could continue working for him. Fox has not shown a reasonable probability of a different trial outcome if any of these witnesses had testified.

Regarding experts, these claims are also purely speculative. Again, the idea that proving that Fox did not suffer from mental illness would have led to a favorable verdict strains credulity. The State asked him if he suffered from mental illness, which he denied. Fox does not explain why an expert would have been necessary to describe the vape pen. Defense counsel introduced photographic evidence of the vape pen, and Fox testified at length regarding how he took it out of his pocket and how Sedminik must have mistaken it for a gun. Fox does not explain how testimony regarding how a person might react in that situation was the province of an expert. Sedminik and Fox both testified in detail as to their versions of the shooting. Trial

---

[3] It appears that Fox's mother made statements to the police that supported the State's theory that Fox suffered delusions or felt persecuted by police. On cross-examination the State asked Fox – based on the FIT report: "Okay. So, do you remember telling your mother that the police and the government were out to get you and they conspired with your ex to take your son?" Exh. 27, p. 116.

1    counsel's tactical decision that unidentified experts were unnecessary was an objectively

2    reasonable exercise of professional judgment. *Strickland*, 466 U.S. at 689–90.

3          Fox has not demonstrated that the Nevada Court of Appeals' decision affirming the

4    denial of this claim was contrary to, or involved an unreasonable application of, *Strickland*, or was

5    based on an unreasonable determination of the facts in light of the evidence presented in the

6    state court proceeding. 28 U.S.C. § 2254(d); *See Pinholster*, 563 U.S. at 190 (The analysis of a claim

7    of ineffective assistance of counsel is doubly deferential where the court takes a highly

8    deferential look at counsel's performance through the deferential lens of § 2254(d)). Fox is not

9    entitled to federal habeas relief for ground 1(a).

10          **Ground 1(b)**

11          Fox contends that trial counsel was ineffective for not making an opening statement

12    (ECF No. 6, pp. 15-16). Thus, he alleges that the jury never heard the defense's version of events.

13          Whether and when to make an opening statement is a matter of trial tactics and will not

14    generally support a claim of ineffective assistance of counsel. *See United States v. Rodriguez-Ramirez*,

15    777 F.2d 454, 458 (9th Cir. 1985); *see also United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir.

16    1985); *see also United States v. Salovitz*, 701 F.2d 17 (2d. Cir. 1983) (explaining the place of the

17    opening statement in modern trial practice); *see also Garner v. State*, 374 P.2d 525, 528 (1962) ("the

18    purpose of the opening statement is to acquaint the jury and the court with the nature of the

19    case."); *Legrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) (trial counsel's decision to reserve

20    any opening statement until he heard the prosecution's evidence was not deficient

21    performance).

22          After the defense rested, outside the presence of the jury, defense counsel made the

23    following record:

24          When I announced my case-in-chief, I did not give an opening. That was
intentional. I waived that because I did not think that it was necessary at that

25    particular point because my only witness was going to be my client.

26          THE COURT: Um-hum.

27          MR. SANFT: And as a result, I want to make sure that's on the record if

28    for whatever reasons reviewed later, I made a tactical decision not to put an
opening on.

1    THE COURT: Okay. All right.

2    Exh. 27, p. 148.

3    In affirming the denial of Fox's state habeas petition, the Nevada Court of Appeals

4    concluded:

5       . . . Fox claimed his trial counsel was ineffective for declining to give an
        opening statement. After the State's opening statement, counsel reserved the
6       defense opening statement. However, counsel did not give an opening statement
        prior to the presentation of the defense's testimony and evidence. The defense
7       proceeded to present testimony and other evidence in support of Fox's assertion
        that the officer must have believed his vaping device was a firearm and Fox only
8       used his firearm after the officer drew a firearm. The purpose of an opening
        statement is merely to explain to the judge and jury the evidence that a party
9       believes will be presented during trial. *Watters v. State*, 129 Nev. 886, 889-90, 313
        P.3d 243, 247 (2013). Because Fox was able to present his testimony and evidence
10      to the jury in support of his self-defense theory, he did not demonstrate a
        reasonable probability of a different outcome had counsel presented an opening
11      statement.
        . . .
12      Therefore, we conclude the district court did not err by denying this claim
13      without conducting an evidentiary hearing.

14

15   Exh. 65, pp. 3-4.

16   Here, the defense presented its case through Fox's testimony and other evidence. Fox

17   testified in detail about his belief that officer Sedminik mistook his vape pen for a gun and that

18   Sedminik fired first. He testified that when he pulled the vape pen out of his front pocket,

19   Sedminik began to run away from him in a zig-zag pattern. Fox said he found the behavior odd.

20   Fox recounted that after Sedminik fired on him he reacted automatically and returned fire. He

21   also explained his understanding about when a person is justified in using deadly force in self-

22   defense:

23      Q: Well, the reason why I'm asking about the CCW [concealed weapons
        permit] is, you had to take a class for that; is that correct?
24

25      A: Yes, I did.

26      Q: And when you take a class for it, can you describe for the jury what you
        learned in that class?
27

28      A: We learn firearm principles, what we can and can't do with the
        firearm, what's legal and what's not legal.

Q: Okay. And with regards to what happened in this case, I mean, you shot at a police officer. Do you understand that?

A: Yes, I do.

Q: Okay. What does your class tell you about that?

A: The class never says about who you're firing at; the class says if -- if deadly violence is upon you, I'm allowed to defend myself. And it doesn't say strictly if a police officer fires at you, you have to lay your weapon down. It says, if anybody comes at me with a knife, a bat, anything that can cause serious bodily harm and cause my death, I have the -- I get to pull out my gun and defend myself.

Q: Okay. Well, what if a person were to come at you just with their fists and try punching you?

A: That -- I could not pull out my firearm and defend myself. That -- it has to be more of a – it'd have to have a weapon involved.

Exh. 27, pp. 114-115.

Fox cannot demonstrate that defense counsel's tactical decision not to make an opening statement prejudiced him in any manner. Counsel likely decided that an opening statement would be needlessly duplicative of Fox's testimony. In any event, the defense theory of the case was clearly presented to the jury. Fox has not demonstrated that the Nevada Court of Appeals' decision affirming the denial of federal ground 1(b) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

**Ground 1(c)**

Fox argues that his trial counsel failed to adequately cross-examine officer Sedminik or Fox's boss, Walter Lawson (ECF No. 6, pp. 16-17). Fox contends that eyewitness Rankins said that the officer fell and then at that point Fox fired first. Sedminik did not testify that he fell, and Fox alleges that cross-examining the officer about whether he fell would have hurt Rankins' credibility. Fox also argues that counsel should have cross-examined Lawson about whether Lawson actually viewed Fox as paranoid or mentally ill.

The Nevada Court of Appeals rejected this claim in its order affirming the denial of Fox's state postconviction petition:

> . . . Fox claimed his trial counsel was ineffective for failing to properly cross-examine witnesses. Fox contended counsel should have highlighted inconsistencies between the witnesses' testimonies concerning the officer's actions during the shooting and should have posed questions in an effort to challenge testimony concerning Fox's feelings toward police officers. The district court concluded the record demonstrated that counsel appropriately cross-examined witnesses concerning these issues, and Fox did not demonstrate his counsel's performance in this regard was objectively unreasonable. Fox also failed to demonstrate a reasonable probability of a different outcome had counsel posed different questions to the challenged witnesses in light of the overwhelming evidence of his guilt. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

Exh. 65, pp. 4-5.

Sedminik's and Rankins' versions of the shooting differed somewhat. But both were clear that Fox pulled a gun and fired on Sedminik as he was trying to run away. Sedminik did not testify that he fell or tripped but he recounted his haste and confusion. The jury could have reasonably found him credible overall even if he was unclear as to some details in the midst of the high- pressure situation. Respondents point out that defense counsel chose to confront Rankins with his prior inconsistent statements in order to challenge Rankins' assertion that Fox fired first. Notably, Sedminik testified that he fired the first shot, and Rankins admitted on cross-examination that he did not actually see who fired the first shot. With respect to Lawson, he testified with particularity as to stories Fox told him about how the police harassed Fox, including cutting his phone line and poisoning him. Lawson's subjective opinion about whether Fox's views on law enforcement or government rose to the level of paranoia or mental illness was irrelevant and likely inadmissible as speculation. Substantial evidence of Fox's guilt was presented. Fox has not demonstrated a reasonable probability of a different outcome if defense counsel had cross-examined Sedminik or Lawson in a different manner. Fox has not shown that the Nevada Court of Appeals' decision rejecting federal ground 1(c) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court denies habeas relief as to ground 1(c).

**Ground 1(d)**

Fox asserts that his counsel was ineffective during Fox's direct examination (ECF No. 6, pp. 17-18). Specifically, Fox claims that defense counsel should have used the vape itself during Fox's testimony, so that Fox could demonstrate how he held it. Fox argues that counsel did not ask him many questions about the shooting itself and failed to address the issue of Fox's mental health.

Fox's counsel examined him regarding how he pulled the vape pen from his pocket and how he was holding it when Sedminik allegedly mistook it for a gun. His counsel used a photograph of the vape pen and let Fox describe the events. Exh. 27, pp. 104-105; (cross-examination: 124-129).

The Nevada Court of Appeals held:

> . . . Fox claimed his trial counsel was ineffective for failing to properly question Fox concerning his version of events and his mental health issues. Fox also contended counsel was ineffective for failing to utilize the vaping device as an exhibit in an effort to bolster Fox's assertion that the officer mistook the vaping device for a firearm. The district court found the record revealed counsel appropriately questioned Fox during trial. The district court also found counsel utilized a photographic exhibit of the vaping device during Fox's testimony. Based on the record, the district court found Fox failed to demonstrate that counsel's performance when questioning Fox was objectively unreasonable. The district court also found Fox failed to demonstrate a reasonable probability of a different outcome had counsel further questioned him about these issues or utilized evidence concerning the vaping device in a different manner. The record supports the district court's decision, and we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

Exh. 65, p. 5.

Respondents point out that if counsel used the actual vape pen during Fox's testimony, jurors would have been able to reach their own conclusions about how much it resembled or did not resemble a gun. Fox argues that his counsel did not question him about the shooting itself, but the record belies this contention. Defense counsel elicited a specific, step-by-step account of events from Fox. Fox also argues that because defense counsel did not question him regarding his mental health it allowed the State to introduce hearsay statements made by his mother. But the prosecution used the statements to impeach him on cross-examination, thus they were

admissible. Trial counsel could have made the eminently reasonable tactical decision that exploring Fox's mental health would detract from his self-defense theory.

Fox cannot demonstrate counsel performed deficiently or that he suffered prejudice. The jury found officer Sedminik's testimony credible. Moreover, Fox admitted to shooting the officer, fleeing the scene, never saying a word to his employer, and concealing his gun in his employer's barbecue. Fox has not demonstrated a reasonable probability of a different outcome at trial had his counsel questioned him differently. He has failed to demonstrate that the Nevada Court of Appeals' decision affirming the denial of federal ground 1(d) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, ground 1(d) is denied.

**Ground 1(e)**

Fox argues that his trial counsel was ineffective for failing to object to the prosecution's improper cross-examination of him regarding privileged attorney-client communications (ECF No. 6, p. 18).

This claim stems from the same exchange that is the subject of ground 5, discussed above. Prosecutor Giordani asked Fox about whether he had discussed the events with his defense counsel, Sanft:

> Q: . . . Mr. Sanft ask you to walk through what happened on the crime scene –
>
> A: Yes.
>
> Q: -- do you remember that? You, I presume, have rehearsed that before, or at least discussed, you know, what you'd say today, right?
>
> A: Rehearsed what?
>
> Q: Your story?
>
> A: I'm not sure what you're saying.
>
> Q: You didn't think about what you were going to say today, talk about it, look at the evidence and strategize?
>
> A: No, I didn't –

1    Mr. Sanft: Objection, Your Honor, I think --

2    THE WITNESS: -- strategize.

3    MR. SANFT: I think it traipses into attorney/client privilege.

4    MR. GIORDANI: I'm not asking for that.

5    MR. SANFT: Okay. Well, once again, I think he's asking for --

6    THE COURT: I think the question is did he -- did he discuss with you his
testimony here today.

7

8    MR. SANFT: Once again, traipsing into attorney/client privilege.

9    MR. GIORDANI: No, I'm not asking for the content of his --

10   THE COURT: Right.

11

12   MR. GIORDANI: --protected conversations. I'm asking did you discuss it, yes
or no?

13

14   THE COURT: Yeah, that's overruled.

15   BY MR. GIORDANI:

16   Q: Yes or no?

17   A: No, I did not.

18   Q: Did not?

19   A: No.

20   Q: You have a lot on the line today, right?

21   A: Correct.

22   Q: I mean, these are serious charges; you understand that?

23   A: Yes.

24   Q: And you did not discuss what happened on that night -- on that morning
with your attorney?

25

26   A: Well, you mean talk about the events that led to it?

27   Q: Yes.

28

1    A: Yes. I did discuss factual information with him.

2    Exh. 27, pp. 120-121.

3    The Nevada Court of Appeals rejected this claim:

4    . . . Fox claimed his trial counsel was ineffective for failing to object when
     the State violated his right to attorney/client privilege as it asked if he had
5    rehearsed or discussed his testimony with counsel prior to trial. Fox cannot
     demonstrate his counsel's performance was objectively unreasonable because
6    counsel objected following the challenged question. In addition, this court
     concluded on direct appeal that any error stemming from this question was
7    harmless, *see Fox v. State*, Docket No. 74333-COA (Order of Affirmance, September
     24, 2018), and, therefore, Fox failed to demonstrate a reasonable probability of a
8    different outcome had counsel performed different actions with respect to the
     challenged question. Therefore, we conclude the district court did not err by
9    denying this claim without conducting an evidentiary hearing.

10

11   Exh. 65, pp. 5-6.

12   As set forth above, Fox's counsel did in fact immediately object when the prosecution

13   asked Fox if he had rehearsed his testimony with his lawyer. It is unclear that the prosecutor's

14   question even violated attorney-client privilege, and Fox had the opportunity to respond and

15   clarify that what he had discussed with his attorney was the facts surrounding the shooting. Fox

16   has not shown that the Nevada Court of Appeals' decision affirming the denial of federal ground

17   1(e) was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an

18   unreasonable determination of the facts in light of the evidence presented in the state court

19   proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 1(e).

20        **Ground 1(f)**

21   Fox alleges that trial counsel was ineffective for failing to join his request for a

22   mistrial during sentencing (ECF No. 6, pp. 19-20).

23   In affirming the denial of Fox's state habeas petition, the Nevada Court of Appeals held:

24   . . . Fox claimed his trial counsel was ineffective for failing to request a
     mistrial because the State violated pretrial orders and failed to provide discovery
25   and *Brady* material. During the sentencing hearing, Fox personally requested a
     mistrial based upon these issues, but the trial court denied Fox's motion for
26   mistrial. Because the trial court considered and rejected Fox's motion for mistrial,
     Fox did not demonstrate a reasonable probability of a different outcome had
27   counsel also moved for a mistrial based upon these issues. Therefore, we conclude
     the district court did not err by denying this claim without conducting an
28   evidentiary hearing.

23

Exh. 65, p. 6.

At sentencing, Fox himself moved for a mistrial and raised specific allegations of prosecutorial misconduct:

> THE DEFENDANT: I'd like to request for a – I'd like to request a mistrial, so I put it on the record if you don't – refuse to recognize the mistrial for prosecutional (sic) misconduct for deliberately withholding evidence which made it inadmissible evidence. They withheld several evidence – witnesses that testified. They also put in hearsay statements from a Joey Ellis and a Barbara Anderson which me and my attorney had no chance of putting any defense up.
>
> They've also wrote in a countermotion for discovery that they would not be using the head force team detective or the force investigation team information which, in fact, they lied because they then used it and then they even had the head detective come in and testify. They also put on there, the witness form, that they would not turn over any witness information if they did not plan on using them during the trial. Again, they lied because they used Moses who then also showed video and they also had a CSI investigator, which we never seen any information from him, and they also had a detective who gathered footage from different locations which none of this was displayed to me and my defense counsel.
>
> And then plus they also brought in a second police officer who then made statements which, again, none of this was turned over to me or my defense lawyer to do any type of cross-examination or rebuttal of any of this. And they also brought in the firearms expert which, again, we didn't have no chance to do any rebuttal or any investigation our self, and the snowball effect basically prejudiced my trial making us unable to do any type of response or any type of defense against this deliberately despicable holding evidence – the Brady violation throughout.
>
> And then the last one I had is the hearsay about Joey Ellis and Barbara Anderson. This is two statements that were never turned over to me or my lawyers, and then they went on the record and then blasted me on the news saying I was a mental case, I had serious issues, I belong in a psychological hospital with no factual evidence from any shrinks. I'm not on any prescriptions, and favorable of -- evidence for State for a character trait or a character – you cannot say that a person committed a crime due to that trait, and that's exactly what they did on the news and in the stand in front of their own trial because they said that because of those two hearsay statements, which weren't given to my lawyer or myself so we can see if they were misquoted or anything like that, they said because of that is the reason why I went out and committed that crime that day, and that's the evidence I have for a mistrial.

. . .

THE COURT: Okay. Thank you, Mr. Fox. Mr. Sanft, are you joining that?

MR. SANFT: Your Honor, I know that my client has made or articulated his position with regards to these issues. I've informed him as well that those would be issues that we raise in appeal, and so he wanted to make sure that the record had received that information and that's the reason why he had done that.

THE COURT: Okay. The record is clear, then.

MR. SANFT: Thank you, Your Honor.

THE COURT: All right. Other than – okay. So if he is making a formal motion at this time I'm denying it.

Exh. 33, pp. 3-5.

The court ruled that, to the extent that Fox moved for a mistrial, the motion was denied. Fox complains that defense counsel did not offer further argument to support Fox's motion for a mistrial, but he does not explain what further arguments should have been offered. The trial court considered Fox's motion and denied it, and defense counsel is not required to take futile action. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *See also Wilson v. Henry*, 185 F.3d 986, 991-92 (9th Cir. 1999).

Fox has not demonstrated counsel was deficient, and he cannot demonstrate prejudice. He has failed to show that the Nevada Court of Appeals' decision that he did not demonstrate a reasonable probability of a different outcome had his counsel also moved for a mistrial was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Thus, the court denies federal habeas relief as to ground 1(f).

**Ground 1(g)**

Fox alleges that counsel was ineffective for failing to meet with Fox until 13 days before trial (ECF No. 6, p. 20).

The Nevada Court of Appeals disagreed:

> . . . Fox claimed his trial counsel was ineffective because counsel waited until 13 days before the start of trial to meet with him to discuss defense trial strategy. Counsel was prepared to present Fox's self-defense theory during trial, and Fox did not demonstrate that counsel's performance in preparing for trial fell below

an objective standard of reasonableness. Fox did not explain how meeting at an earlier time would have altered his trial defense, and, therefore, he failed to demonstrate a reasonable probability of a different outcome at trial had he met with counsel to discuss strategy at an earlier time. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

Exh. 65, pp. 6-7.

Fox never explains how meeting sooner with his counsel would have led to a different result at trial; he simply makes the bare assertion that because they did not meet sooner, he was prevented from getting a fair trial. Fox's self-defense version of events was presented with specificity to the jury. The Nevada Court of Appeals' rejection of this claim was not contrary to, nor did it involve an unreasonable application of, *Strickland*. It also was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

**Ground 2**

Fox argues that his appellate counsel rendered ineffective assistance because he did not challenge on appeal the denial of Fox's oral motion for mistrial as well as the underlying individual allegations of prosecutorial misconduct that prompted the motion for mistrial (ECF No. 6, pp. 23-25).

The Nevada Court of Appeals rejected this claim:

. . . Fox claimed his appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by denying his request for a mistrial because the State violated pretrial orders and failed to provide discovery and *Brady* material. Fox personally requested a mistrial because he believed the State violated its pretrial obligations to disclose evidence and information concerning witnesses, but the trial court concluded Fox's motion lacked merit and denied the motion. Fox did not demonstrate that the trial court abused its discretion by denying his motion for mistrial. *See Ledbetter v. State*, 122 Nev. 252, 264, 129 P.3d 671, 680 (2006). He therefore did not demonstrate counsel's performance fell below an objective standard of reasonableness by failing to raise the underlying claim on direct appeal, or a reasonable likelihood of success on appeal had counsel done so. Accordingly, we conclude that the district court did not err by denying this claim without conducting an evidentiary hearing.

Exh. 65, pp. 8-9.

As discussed above, the state appellate court did not unreasonably reject the claim that Fox's trial counsel was ineffective for failing to join his oral motion for mistrial. Similarly, the Nevada Court of Appeals cannot have been unreasonable in rejecting the claim that appellate counsel was ineffective for failing to raise this meritless claim on appeal. Federal habeas relief is therefore denied as to ground 2.

**Grounds 3 and 4: Cumulative Error of Trial and Appellate Counsel**

Finally, Fox argues that the cumulative error of trial counsel as well as the cumulative error of appellate counsel entitle him to federal habeas relief (ECF No. 6, pp. 27-28, 30-31).

"[T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 927–28 (9th Cir. 2007) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)). "[C]umulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Donnelly*, 416 U.S. at 643.) "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

As is explained by the disposition of his claims herein, Fox has not demonstrated error to cumulate. In light of the substantial evidence presented at trial Fox has not demonstrated that the Nevada Court of Appeals' decisions on federal grounds 3 and 4 were contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, relief on grounds 3 and 4 is denied.

The petition, therefore, is denied in its entirety.

V.     **Certificate of Appealability**

This is a final order adverse to Fox. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). This court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a

27

COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under §

2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the

denial of a constitutional right." With respect to claims rejected on the merits, a petitioner

"must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

*Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the court finds a

certificate of appealability is unwarranted.

VI.    **Conclusion**

**IT IS THEREFORE ORDERED** that the petition for writ of habeas corpus (ECF No. 6)

is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly

and close this case.


DATED this 7th day of July, 2022.

_____
UNITED STATES DISTRICT JUDGE